FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Guy Cardamone, Madison Supervisor
John W. Campion
Alexandra Douglas
Ramuel R. Figueroa
Matthew Giesfeldt
Jonathan Greenberg
Gabriela A. Leija
Julie K. Linnen
Dennise Moreno
Tom Phillip
Alex Vlisides

411 East Wisconsin Avenue
Suite 2310
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

July 24, 2026

Honorable Brett H. Ludwig
United States District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE: *United States v. Roshan Shah*
Case No. 25-cr-161

Dear Judge Ludwig:

Roshan Shah got pulled into this money laundering scheme by a trusted friend at a moment in which he was feeling intense pressure to make money quickly to preserve his ability to stay in Canada as an international student. Roshan did not know at the outset that he would be picking up packages from victims of wire fraud. But he unfortunately did not back out when it became clear that he was involved in illegal activity. Over the last year, while he has been in custody at the Dodge County Jail, Roshan has had to grapple with the harm he caused to the victims, his family, and his future.

At the sentencing hearing on July 27, 2026, the defense will ask the Court to impose a sentence of time served (11 months and 24 days). Such a sentence is sufficient to satisfy the sentencing goals under 18 U.S.C. § 3553, considering the circumstances that led Roshan to engage in the money laundering scheme by picking up and delivering packages and the outsize impact this conviction will have on his future livelihood. It would sufficiently reflect the seriousness of Roshan's conduct and the harm incurred by the victims, while also recognizing the minimal role that he played in the overall scheme, including his relative lack of monetary benefit from the scheme.

**<u>Background</u>**

*A. Roshan's family experienced economic insecurity in Western India*

Roshan grew up in a small city in western India in a traditional Hindu family. His father, Sharvan, operated a stall at the local street market, selling seasonal goods and stationery. During Roshan's early childhood, his father's shop generated a reliable income. But everything changed when Roshan became a teenager, as "mall culture" exploded in Roshan's hometown, diverting shoppers from traditional bazaars to modern shopping malls (which dazzled shoppers with air conditioning, international brands, and lower prices). Like many street vendors, Sharvan's income plummeted. Roshan overheard many tense conversations between Sharvan and his mother, Manjula, about how Sharvan's meager income could possibly cover the rent on the small apartment in which the family lived, in addition to the rent Sharvan paid to operate a market stall. The Shah's lived hand to mouth, often relying on support from extended family to make ends meet.

Below are screenshots from Google street-view of the market (the Sardar ganj market in Anand, Gujarat) where Roshan's father worked, and a photo of one of the vendors:






*B. Roshan's parents sent him to study in Canada hoping that he would find economic opportunities that would benefit their whole family*

Like many parents, Sharvan and Manjula desperately wanted their sons to have better economic opportunities than their own. Due to a complex combination of structural, political, and cultural factors, socio-economic mobility is extremely limited in India. Access to quality education and employment opportunities is determined largely by one's family background.[1] A one-way plane ticket abroad is viewed by many as the sole

[1] One economist recently described India as "one of the worst countries in terms of opportunities for upward mobility." Pranab Bardhan, Awakening Giants, Feet of Clay 132 (2010). The World Economic Forum's Global Social Mobility Index, which assessed global economies along five dimensions of social mobility in 2020, ranked India 76th among 82 economies. *See* World Economic Forum, The Global Social Mobility Report 2020, 7 (Jan. 2020), *available at* https://www3.weforum.org/docs/Global_Social_Mobility_Report.pdf. Another metric for mobility is Intergenerational Income Elasticity (IGE), which measures how much a 1% rise in a parent's income affects

pathway to middle-class stability. Because there are so few spots available relative to demand at quality higher educational institutions, and because employment prospects for even well-educated recent graduates are dismal, many young Indians feel as though leaving their home country to pursue education and a career abroad is their only hope.[2] As one young person told a Reuters journalist, "There is no option but to quit India."[3] In the past, it was primarily children from wealthy and well-connected families who ventured abroad for an education. Now, there's increasing pressure on families of modest means to scrap together funding to send their children overseas, in the hopes that the future economic pay-off will make up for the tremendous sacrifices.[4]

Roshan's mother, Manjula, noticed that Roshan was a curious and hardworking student, who always ranked near the top of his class. When he entered high school, she began daydreaming about sending him to Canada to earn a college degree and find a well-paying job. In recent years, Canada has become the top destination for Indian students studying abroad, in part because Canada offers a post-graduation work permit and opportunities to apply for permanent residence and ultimately Canadian citizenship.[5]

---

their child's income. Per this metric, India has one of the least mobile economies, on par with Brazil and South Africa. *See* Rajesh Shukla, *How to Close India's Rich Dad-Poor Dad Gap*, Times of India (July 4, 2025), https://www.price360.in/articles-details.php?url=how-to-close-indias-rich-dadpoor-dad-gap#:~:text=To%20appreciate%20the%20gravity%20of,automatically%20dismantle%20inequality%20of%20opportunity.

[2] *See, e.g.*, Bryce Loo, *India's Moment: An Examination of Student Mobility from and to a Key Player*, WENR (Feb. 6, 2025), https://wenr.wes.org/2025/02/indias-moment-an-examination-of-student-mobility-from-and-to-a-key-player ("[T]wo major challenges, in particular, prompt many of India's most talented students to go abroad: lack of seats in quality institutions and programs and problems securing gainful employment after graduation"); Murali Krishnan, *What's Behind High Joblessness Among India's Youth*, DW (Apr. 2, 2024), https://www.dw.com/en/whats-behind-high-joblessness-among-indias-youth/a-68721599 (explaining that the Indian economy has not created enough jobs for the growing share of young and educated Indians entering the labor market); Kunal Purohit, *India's Silent Youth Crisis: College-Educated but Poorer than a Farm Hand*, Al Jazeera (May 2024), https://www.aljazeera.com/features/2024/5/15/indias-silent-youth-crisis-college-educated-but-poorer-than-a-farm-hand.

[3] Manoj Kumar, et al., *Rural Indians Join Rush to Study Abroad as Prospects Dim at Home*, Reuters (Sep. 7, 2022), https://www.reuters.com/world/india/rural-indians-join-rush-study-abroad-prospects-dim-home-2022-09-07/.

[4] *Id.*

[5] *See* Bryce Loo, *India's Moment: An Examination of Student Mobility from and to a Key Player*, WENR (Feb. 6, 2025), https://wenr.wes.org/2025/02/indias-moment-an-examination-of-student-mobility-from-and-to-a-key-player; Manoj Kumar, et al., *Rural Indians Join Rush to Study Abroad as Prospects Dim at Home*, Reuters (Sep. 7, 2022), https://www.reuters.com/world/india/rural-indians-join-rush-study-abroad-prospects-dim-home-2022-09-07/.

Roshan and his peers believed that moving abroad after high school was their only pathway to economic stability. Roshan was inundated with advertising and messaging related to overseas education throughout his teenage years. Billboards and buses were plastered with advertisements for English language tutoring services and global education consulting firms. Roshan's social media feed was filled with images of Indian students in Canada driving nice cars and living in nice apartments. Roshan watched YouTube videos of Indians explaining how they navigated various immigration complexities and landed lucrative jobs abroad. References to life abroad were made in movies and in music. The message was clear: riches awaited those who made it abroad.[6]

Roshan's family was not well-off, and so Roshan's paternal relatives dug deep into their savings and sacrificed their own needs to build a "Canada fund" for Roshan. Roshan also worked his way through high school at his father's market stall, saving whatever he could to advance the goal of moving overseas for an education.

After completing twelfth grade, Roshan began preparing for his English proficiency test, a prerequisite to obtaining a Canadian Visa. When he passed the test, he applied for a Canadian Visa and to Canadian colleges. The language test, Visa application, and college applications were expensive. Roshan leaned heavily on extended family to pay for the tests and applications, with the promise that he would repay them with the high income he was sure to earn in Canada. After Roshan received his Canadian Visa in May 2023, he again relied on family to pay for his airfare to Canada and his first semester tuition. The financial strain was difficult on everyone, but the sacrifice seemed worth it; if Roshan found success in Canada, he would be able to send money back to India for decades to come.

*C. Roshan faced unexpected challenges when he moved to Canada in 2023*

Roshan moved to Ontario in August 2023, at the age of eighteen. He was devastated to leave his family, knowing he might never return home, and he was nervous about starting life in a new place where he had no connections. At the same time, he was

[6] It has been reported that some college recruiters, who earn commissions by signing up students to attend school in Canada, "paint[] a distorted picture of the education on offer and the ease of life in Canada." Nazim Baksh, et al., *International Students Enticed to Canada on Dubious Promises of Jobs and Immigration*, CBC (Oct. 13, 2022), https://www.cbc.ca/news/canada/international-students-canada-immigration-ontario-1.6614238.

bursting with optimism about the opportunities he would seize in Canada. While sitting on the plane preparing for takeoff, he had the feeling that he'd somehow beaten the odds. Not only was he no longer destined to work in a market stall like his father, struggling to make ends meet, but the money he'd make in Canada would lift his parents out of poverty too. He imagined buying a spacious house on a huge plot of land, and flying his father, mother, and brother to Canada to move in with him.

Roshan enrolled in a child and youth care program at Mohawk college in Hamilton, Ontario, not far from Toronto. The reality of being an Indian student in Ontario was far from what he imagined it would be. Roshan struggled to understand his professors who spoke English with thick accents. He had few friends. He often ate dinner alone, trying his best to emulate his mother's cooking. Roshan was an outsider among his majority white Canadian classmates. He also faced outright hostility from Canadian students and community members. Roshan is not alone in this experience. As the number of Indian international students in Canada has grown, so too have reports of prejudice and discrimination against Indian students.[7] Increasingly after the pandemic, Indian students have become scapegoats for Canada's housing, health care, employment, and infrastructure problems.[8] In September 2023, just after Roshan's arrival in Canada, the Indian Foreign Ministry urged Indian students in Canada to "exercise utmost caution" considering "growing anti-India activities and politically condoned hate crimes and criminal violence in Canada."[9] The Institute for Strategic Dialogue, an international NGO, notes that anti-South Asian hate, both online and off, has "skyrocketed" in Canada in recent years.[10]

---

[7] Hate crimes against South Asians in Canada increased by 143 percent between 2019 and 2022. Rupinder Liddar, *The Familiar Rise of Anti-Indian Racism in Canada*, Policy Options (Nov. 1, 2024), https://policyoptions.irpp.org/2024/11/anti-indian-racism-canada/ (citing a 2022 report from the national statistical office, Statistics Canada). Indian students have also reported an uptick in anti-Indian vitriol online. *See, e.g.*, Josiah Sinanan, *South Asian Newcomers to Canada Say Online Hate is Taking Toll*, CBC (June 22, 2024), https://www.cbc.ca/news/canada/windsor/south-asian-newcomers-to-canada-say-online-hate-is-taking-a-toll-1.7243057.

[8] *See, e.g.*, Rumneek Johal, *Canada's Far Right is Targeting South Asian and Sikh Canadians to Incite Anti-Immigrant Hate*, Press Progress (Aug. 8, 2024), https://pressprogress.ca/canadas-far-right-is-targeting-south-asian-and-sikh-canadians-to-incite-anti-immigrant-hate/.

[9] YP Rajesh and Rupam Jain, *India Tells Citizens in Canada to Exercise Caution as Relations Worsen*, Reuters (Sept. 20, 2023), https://www.reuters.com/world/india/indias-opposition-congress-dismisses-canadas-suspicions-sikh-leaders-murder-2023-09-20/.

[10] Institute for Strategic Dialogue, The Rise of Anti-South Asian Hate in Canada (June 2025), https://www.isdglobal.org/digital_dispatches/the-rise-of-anti-south-asian-hate-in-canada/#

Perhaps in response to anti-immigrant sentiment, the Canadian government announced several changes to its immigration policies in the fall of 2024, just a year after Roshan arrived in Canada. The new policies created a profound unease among international students who'd come to believe their future livelihoods depended on their ability to stay in Canada. As one student put it, "the goalposts for international students keep shifting."[11] While Roshan wasn't directly impacted by the policy changes, the discourse around tightening immigration laws—and the incessant online comments calling for the deportation of all Indians—impacted his mental health. It also made him feel like his days in Canada might be numbered, which added to the pressure he felt to make the most of every opportunity made available to him.

After a year at Mohawk college, Roshan transferred to Sault College in Sault Ste. Marie, Ontario, to pursue a two-year mechanical engineering degree. While he believed the mechanical engineering program would be a better fit for his interests and skill set, transferring schools was expensive and destabilizing. He had struggled to find his footing at Mohawk college, and now he was starting again from square one. It took a toll on Roshan's already fragile mental health.

*D. Roshan was financially desperate when his close friend approached him about an opportunity to make money in the United States*

Roshan had anticipated that it would take time to adjust to life in Canada. But he was caught off guard by how much he struggled financially. Tuition was expensive (approximately CAD $18,000 per year),[12] the cost of living was high, and well-paying work was hard to come by.[13] Moreover, as an international student, he was limited by

---

[11] Ali Amad & Alex Cyr, *These International Students Wanted Citizenship. Canada Killed that Dream*, Maclean's (Nov. 19, 2024), https://macleans.ca/society/these-international-students-wanted-citizenship-canada-killed-that-dream/.

[12] Higher education is exceedingly expensive for international students, who generally pay higher tuition fees—potentially four times as high as domestic students —and lack the same access to scholarships, financial aid, and loans. *See* Dakshana Bascaramurty, et al., *Canada's International Student Recruiting Machine is Broken*, The Globe and Mail (Oct. 27, 2023), https://www.theglobeandmail.com/canada/article-india-canada-international-student-recruitment/; Avneet Dhillon, *What's Behind the Problems with Canada's International Student Program*, CBC News (Jan. 26, 2024), https://www.cbc.ca/news/canada/intl-student-program-1.7095990.

[13] There is a high concentration of international students in Ontario, and the competition for low-wage, part-time work is fierce.

Canadian policy to working just 24 hours per week while classes were in session.[14] The depreciating value of the rupee against the Canadian dollar added to the economic squeeze. Roshan had been led to believe that he would have an easy time finding a lucrative job in Canada to fully cover his tuition and living expenses after his first year, with money left over to send to relatives in Canada. As explained above, this wasn't just wishful thinking on Roshan's part—it's the message being promulgated by college recruiters in India.[15]

Roshan worked the only jobs he could find—at a pizza restaurant, delivering coolers for Pura Lita, delivering food for Uber and Door Dash, and driving for a ridesharing app. He saved money on housing by living in a small apartment with several roommates. He cooked his own meals. He was extremely thrifty, doing whatever he could to avoid spending money.

In the spring of 2025, Roshan got a welding job at a local metal fabrication company called Torque-Fab, Inc. He planned to work through the spring and into the summer, when his work restrictions would temporarily lift. He intended to supplement his work at Torque-Fab with driving shifts (delivery and ridesharing) to earn the money he needed to pay tuition for Fall 2025 and save for living expenses.

Unfortunately, about three months into his job at Torque-Fab, Roshan was laid off because the company was impacted by tariffs imposed by the United States. Roshan was devastated. He was also desperate—he had no alternative job prospects. He needed to earn money to pay his Fall tuition by the end of August, and the clock was ticking. He knew that if he didn't pay his tuition on time, his student visa would be canceled, and he'd be swiftly deported back to India. An abrupt and premature end to his education would make him a failure in the eyes of his extended family who pooled their resources and pinned their hopes on Roshan's success in Canada.

It was during this period of full-blown panic that Roshan's good friend, a fellow student from Roshan's home state of Gujarat, approached him about a job opportunity in the United States. This friend knew that Roshan had obtained a travel visa to the United

[14] Government of Canada, Help Centre, https://ircc.canada.ca/english/helpcentre/answer.asp?qnum=503&top=15.

[15] Nazim Baksh, et al., *International Students Enticed to Canada on Dubious Promises of Jobs and Immigration*, CBC (Oct. 21, 2022), https://www.cbc.ca/news/canada/international-students-canada-immigration-ontario-1.6614238.

States that spring. (Roshan had no immediate plans to travel to the U.S. when he had applied for the visa, but he'd always dreamed of visiting, and so he applied as an investment in his ability to travel to the U.S. in the future.) Roshan regarded this friend, who was around seven years his senior, like an older brother. This friend had also come from a lower-middle-class background in Gujarat, and he had lived in Sault Ste. Marie for several years before Roshan arrived. He took Roshan under his wing when Roshan transferred to Sault College.

As Roshan explained in his post-arrest interview with law enforcement, this friend connected him, remotely, to the individual who gave Roshan directions for traveling to the United States and picking up and delivering packages while in the States. As Roshan stated in his interview, his job in the U.S. was to "collect the parcel and deliver the parcel." As compensation, Roshan anticipated that his living and travel expenses would be reimbursed, and he anticipated being paid approximately USD $20,000-30,000 when he returned to Canada. Notably, this verbal agreement was never set in stone.

Roshan paid considerable travel and living expenses from his own pocket while he was in the U.S., depleting his accounts. This created even more pressure for Roshan to continue picking up and delivering packages throughout the summer, before returning to Canada for school. Not only did he have to pay tuition, but he now also had to repay the thousands of dollars he'd spent on flights, hotels, rental cars, and other living expenses in the U.S.

**Sentencing Considerations**

Roshan's dream when he moved to Canada was to earn a degree, find a stable career, obtain permanent residency and then Canadian citizenship, and ultimately pay for his parents and younger brother to join him in Canada. Roshan didn't abandon this "legitimate path towards wealth and success" to live a life of fraud, as the government suggests. Dkt. No. 37 at 2. Rather, he was sucked into the money laundering scheme because he was desperate to *remain* in school in Canada so he could continue pursuing a stable career in mechanical engineering.

Because of his short-sighted and misguided decision making, Roshan's dream of building a life for himself and his family in the West is gone. After serving a sentence in this case, Roshan will be deported back to India. In Roshan's words, he will "start from zero." The time and money he spent working toward a mechanical engineering degree in Canada

will do him little good in India. He will face the same bleak education and job prospects that prompted him to move abroad. A conviction in this case will likely make him permanently inadmissible to Canada and the U.S. Even if he were not barred from entering either country, it's exceedingly unlikely that he will ever again have the means to travel beyond India to enroll in school.

These immigration consequences are part of the punishment of a conviction. Additional prison time is not necessary to satisfy the goal of punishment. If the Court does impose additional prison time, it should take into account the fact that, because Roshan is a non-citizen without legal status in the United States, he will almost certainly serve nearly the entirety of his sentence in prison, as the BOP (per current policy) will not grant him early release to a halfway house or home confinement based on his immigration status.[16] After Roshan completes his BOP sentence, he will most likely be transferred to immigration confinement for an untold amount of time before deportation to India (or elsewhere).

A sentence of time served is also sufficient to deter Roshan from committing crimes in the future. Before this offense, Roshan had never been in any kind of serious trouble. He'd certainly never been to jail. Being detained at the Dodge County Jail has been eye-opening, and terrifying, for him. As the letters from Roshan's family and friends make clear, Roshan's involvement in this scheme was completely out of character for him. Up until this point, Roshan has "hustled" to make money by working thankless, low-wage jobs with long hours. His drive to gain economic stability, and to be able to provide for his family what they weren't able to provide for him, is one of his greatest strengths. It's not a risk factor for future crime, as the government suggests.

The government argues that a longer prison term is necessary to send a message to young people at risk of traveling to the U.S. to engage in these fraud schemes. But there's little

[16] While the BOP's policy of excluding non-citizens from applying earned time credits toward pre-release custody under the First Step has been the subject to litigation over the past year, the BOP's policy of denying early transfer to pre-release custody or home confinement appears to remain in place. *See* Walter Pavlo, *Bureau of Prisons Limits First Step Act Credits for Non-Citizens*, Prisonology (Oct. 23, 2025), https://www.prisonology.com/blog/bureau-of-prisons-limits-first-step-act-credits-for-non-citizens; Federal Bureau of Prisons, First Step Act – Frequently https://www.bop.gov/inmates/fsa/faq.jsp#fsa_time_credits ("Deportable aliens may earn FTC, but they are not eligible to apply these credits towards their release date if they are subject to a final order of removal under immigration laws.").

evidence that a prison sentence imposed here will have any general deterrent effect.[17] If anything, the evidence suggests that the certainty of punishment is far more salient than the severity of punishment for general deterrence, and here Roshan was swiftly caught and charged.[18]

Finally, a time served sentence accounts for Roshan's young age. Roshan traveled to the United States shortly after he turned 21. A large body of research shows that brain development continues through one's mid-20s, and the prefrontal cortex—the part of the brain responsible for reasoning and impulse control—"is among the last brain regions to develop."[19] As the United States Sentencing Commission has recognized, "people may not gain full reasoning skills and abilities until they reach age 25 on average."[20] At 21, Roshan was susceptible to peer pressure, especially from a friend that he looked up to like an older brother. He was also less able to evaluate the potential ramifications of his actions, and his judgment was further clouded by the fact that he was isolated from family supports and was under immense pressure to finance his education under impossible economic circumstances. Roshan's role was not well-planned or carefully executed. He simply followed directions. He made no effort whatsoever to hide his identity or cover his tracks. He used his real name to book flights, hotels, and car rentals. He used his own phone to communicate with Montu and never took steps to hide or delete their communications.

---

[17] *See, e.g.*, U.S. Dept. of Justice, Nat'l Inst. of Justice, Five Things About Deterrence (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf

[18] *See, e.g.*, *Id.* (recognizing that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment," and acknowledging that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime"); Valerie Wright, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, The Sentencing Project 1 (Nov. 2010), *available at* http://www.antoniocasella.eu/nume/Wright_2010.pdf.

[19] *See, e.g.*, *Commonwealth v. Mattis*, 224 N.E.3d 410, 422 (Mass. 2024) (holding that the imposition of LWOP sentences on emerging adults ages 18 to 20 constitutes cruel and unusual punishment); *see also, e.g.*, Vincent Schiraldi, et al., Community-Based Responses to Justice-Involved Young Adults 1 (Sept. 2015), https://www.ncjrs.gov/pdffiles1/nij/248900.pdf ("[R]esearch confirm that brain development continues well into a person's 20s, meaning that young adults have more psychosocial similarities to children than to older adults."); U.S.S.C., Youthful Offenders in the Federal System 5 (2017), https://tinyurl.com/5n8v62ah (recognizing that "people may not gain full reasoning skills and abilities until they reach age 25 on average"); Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychol. 1009, 1012 (2003); Laurence Steinberg, et al., *Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation*, 21 Dev. Sci. 2, 15–16, 20 (2018).

[20] *See* U.S.S.C., Youthful Offenders in the Federal System 5 (2017), https://tinyurl.com/5n8v62ah.

**Sentencing guidelines**

The sentencing guidelines are a poor reflection of Roshan's role in the money laundering scheme, which was limited to picking up packages from unknown victims, counting the money contained inside, and dropping off packages to unknown co-conspirators. All of his actions were at the direction of an individual he knew only as Montu, and Roshan stood to benefit significantly less than others involved in the scheme—a total payout of $30-60,000 would be just a tiny fraction (around 1%) of the total value of the packages he picked up and delivered.

The sentencing guidelines range is disproportionately high because it is tethered to the total amount of loss. If the loss table instead reflected Roshan's expected personal gain ($30-60,000), and he accordingly received a 4-level enhancement rather than an 18-level enhancement under §2B1.1(b)(1), his guidelines range would be 8-14 months. In calculating the guidelines, this Court should also consider the 2026 amendments to the sentencing guidelines that will take effect on November 1, 2026. Under the amended §2B1.1(b)(1), Roshan would only receive a 16-level enhancement for a loss greater than $2,000,000 but less than $5,000,000.[21] All other calculations remaining the same, his amended guideline range would be 46-57 months.

Additionally, Roshan's minor role in the money laundering scheme warrants a 2-level reduction under §3B1.2(b), as he is substantially less culpable than his co-conspirators. Application note 3(A) to §3B1.2 indicates that an adjustment under this guideline is appropriate for a fraud defendant who is accountable under §1B1.3 for a loss amount under §2B1.1 that "greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme . . . ." As discussed in more detail below, Roshan is accountable under the guidelines for a loss amount that significantly exceeds his modest personal gain, and by design he had limited knowledge of the scope or structure of the money laundering conspiracy. The factors that a Court should apply in evaluating whether a defendant qualifies for this reduction, *see* U.S.S.G. §3B1.2 application note 3(C), support a 2-level reduction in Roshan's case:

---

[21] The full text of the amendments can be found here: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202604_prelim-RF.pdf.

**The degree to which the defendant understood the scope and structure of the criminal activity:** Roshan had little to no knowledge of the scope or structure of the money laundering scheme. He was connected to Montu by his friend, but he did not know Montu's real identity, nor did he know who else Montu worked with or worked for. He didn't know whether or how many other individuals were picking up packages like himself. He knew nothing about the individuals giving him packages at the pick-up points (beyond the basic biographical information provided to him by Montu), and he likewise had no idea what happened to the packages after he dropped them off at the drop-off points. He had no history working with Montu and thus wasn't in a position to speculate about the conspiracy's scope or structure. Nor did he know the spot price of gold or the value of the gold bars that he picked up and delivered. Montu purposefully kept Roshan in the dark so he wouldn't have information to provide in the event he was apprehended.

That Roshan cannot identify with precision other members of the conspiracy and their relative roles does not preclude application of the minor role adjustment. *See United States v. Diaz*, 884 F.3d 911, 917 (9th Cir. 2018). This factor—the degree to which the defendant understood the scope and structure of the criminal activity—acknowledges that "a true minor participant may be unable to identify other participants with specificity." *Id.* Indeed, "when a defendant knows little about the scope and structure of the criminal enterprise in which he was involved, that fact weighs in favor of granting a minor-role adjustment." *Id.*

**The degree to which the defendant participated in planning or organizing the criminal activity:** The government agrees that Roshan played no role in planning or organizing the scheme. He was connected to an ongoing conspiracy by his friend, and he followed explicit directions from Montu at every step. While this money laundering scheme was highly coordinated, it was done so by others unknown to Roshan. Roshan played no role in coordinating the package pickups or drop offs. He did not communicate with victims, apart from picking up packages. He did not communicate with other co-conspirators involved in the package transfers.

**The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority:** The government also agrees that Roshan had no decision-making authority. He was instructed as to when and where to travel to pick-up and drop-off locations, and he did what he was told. In terms of relative authority, the evidence suggests Roshan was on the bottom rung of the ladder.

**The nature and extent of the defendant's participation in the commission of the criminal activity:** Roshan's participation was confined to following Montu's instructions to pick up packages, count the contents, and drop off packages at a point arranged by someone else. His participation in the conspiracy was also time-limited: he participated in picking up packages over the course of 38 days, from June 26, 2025, to August 3, 2025. He was also completely replaceable—he possessed no special knowledge, skill, or experience that he applied to his role in this conspiracy, and he notably had no prior history with members of this conspiracy or with money laundering generally.

**The degree to which the defendant stood to benefit from the criminal activity:** Roshan expected to make a modest profit relative to the amount of money he delivered to co-conspirators. He expected that when he returned to Canada, he would be paid approximately $2,000 to $4,000 per pickup plus reimbursement for his travel expenses—a fraction of the $3,702,156 that he delivered to his co-conspirators. Roshan expected to make a fixed fee that was set by Montu in advance of Roshan's participation as a courier—Roshan did not have an ownership interest or other stake in the money laundering operation. *See Diaz*, 884 F.3d at 918 (remanding for resentencing on issue of whether drug courier defendant was entitled to adjustment under §3B1.2(b) and noting that the defendant "was to receive a set fee . . . and had no ownership interest or other stake in the outcome of the trafficking operation").

While Roshan's role of picking up and dropping off packages was necessary for the scheme to function, application note 3(C) instructs that a defendant may receive an adjustment even if his role in the criminal activity is "essential or indispensable." *See also United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011) ("[P]laying a necessary role does not definitively prevent that same role from being minor. This principle is readily seen in the wealth of cases where drug couriers receive the benefit of the adjustment, even though their role is necessary to the drug distribution."); *United States v. Williams*, 302 F. Supp. 2d 945, 952 (E.D. Wis. 2004) ("The focus is on the relative culpability of the defendant compared to the other participants in the offense, not on whether the defendant was an essential link in the chain of causation." (internal citations omitted)).

Additionally, a defendant is not precluded from mitigating role consideration because they engaged in repeated acts. *See Leiskunas*, 656 F.3d at 739 ("a defendant's repeated, negligible participation in a fraudulent scheme does not, by itself, doom qualification for a minor role adjustment").

Notably, the Sentencing Commission added the factors discussed above in 2015 to increase the number of defendants receiving minor-role reductions. *See* U.S.S.G. app. C amend. 794 reason for amend. (2015) (noting Commission's concern that the mitigated-role reduction was being applied "inconsistently and more sparingly than the Commission intended").

**Conclusion**

By asking for a sentence of time served, the defense does not intend to diminish the harm Roshan and his co-conspirators caused. The victims have suffered significant economic loss and concomitant stress, fear, guilt, anxiety, and loss of confidence from family members. But the fraud was instigated by individuals above Roshan; Roshan was a cog in an elaborate machine set up by others. The unfortunate reality is that if Roshan had not taken on this role, someone else would have filled it.

While he was picking up and delivering packages, Roshan didn't know who the victims were. He didn't know their circumstances or why they were giving him cash and gold bars to deliver to others. He does now, and he feels considerable shame and remorse for helping to perpetuate this fraud. Roshan should be held accountable for his role in the conspiracy, but he should not be made to answer for a scheme that went well beyond his personal knowledge and conduct as a result of the government's inability to hold the organizers and leaders accountable. Roshan has spent a year in custody. He will spend additional time incarcerated as he awaits removal. A sentence of time served is sufficient under 18 U.S.C. §3553(a), considering Roshan's role in the offense and the fact that he will be deported to India upon finishing his sentence with no hope of returning to the U.S. or Canada, which is a devastating punishment for Roshan and his family.

Sincerely,

*/s/ Alexandra Douglas*
Alexandra Douglas